UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HUNG NGUYEN                                                                CIVIL ACTION

VERSUS                                                                           NO. 19-840

DARRELL VANNOY                                                       SECTION: "A"(3)

REPORT AND RECOMMENDATION

Petitioner, Hung Nguyen, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On February 23, 2010, petitioner was convicted under Louisiana law of aggravated rape and unauthorized use of a motor vehicle.[1]  On March 4, 2010, he was sentenced on the rape conviction to a term of life imprisonment without benefit of probation, parole, or suspension of sentence and on the motor vehicle conviction to a concurrent sentence of ten years imprisonment.[2]  The Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences on December 28, 2011,[3] and the Louisiana Supreme Court denied his related writ application on May 18, 2012.[4]

---

[1] State Rec., Vol. 3 of 6, transcript of February 23, 2010, p. 107; State Rec., Vol. 1 of 6, minute entry dated February 23, 2010; State Rec., Vol. 1 of 6, jury verdict forms.
[2] State Rec., Vol. 1 of 6, transcript of March 4, 2010; State Rec., Vol. 1 of 6, minute entry dated March 4, 2010.
[3] State v. Nguyen, 88 So. 3d 511 (La. App. 5th Cir. 2011); State Rec., Vol. 5 of 6.
[4] State v. Nguyen, 89 So. 3d 1192 (La. 2012); State Rec., Vol. 1 of 6.

On or after July 11, 2017, petitioner filed a motion to correct an invalid sentence with the state district court.[5] That motion was denied on July 27, 2017.[6] His related writ applications were likewise denied by the Louisiana Fifth Circuit Court of Appeal on September 21, 2017,[7] and the Louisiana Supreme Court on October 15, 2018.[8]

On or after January 29, 2019, petitioner filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[9] The state filed a response arguing that the application is untimely.[10] The state is correct.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[11] With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

---

[5] State Rec., Vol. 1 of 6. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to this motion, the Court will simply use the date of the cover letter which accompanied the motion as the filing date, in that the motion was could not have been placed in the mail any earlier than that date.

[6] State Rec., Vol. 1 of 6, Order dated July 27, 2017.

[7] Nguyen v. Vannoy, No. 17-KH-522 (La. App. 5th Cir. Sept. 21, 2017); State Rec., Vol. 6 of 6.

[8] State *ex rel.* Nguyen v. State, 254 So. 3d 686 (La. 2018); State Rec., Vol. 6 of 6.

[9] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Although the date petitioner his application to prison authorities is not reflected in the record, that date could not have been any earlier than January 29, 2019, the date he signed the application. See Rec. Doc. 1, p. 6.

[10] Rec. Doc. 10.

[11] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application on May 18, 2012. Accordingly, his state criminal judgment became final for AEDPA purposes on August 16, 2012. As a result, his one-year federal limitations period commenced on that date and then expired on August 16, 2013, unless that deadline was extended through tolling.

The Court first considers statutory tolling. The AEDPA provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). However, petitioner had no such applications pending before the state courts on or before August 16, 2013.[12] Therefore, he clearly is not entitled to statutory tolling.[13]

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "equitable tolling is unavailable in most cases …." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811

---

[12] Although petitioner sought documents during that period, an application seeking documents is not considered an application "for State post-conviction or other collateral review" for tolling purposes because it is preliminary in nature and does not directly call into question the validity of a petitioner's conviction or sentence. Higginbotham v. Tanner, Civ. Action No. 10-1130, 2011 WL 3268128, at *1 (E.D. La. July 29, 2011); Parker v. Cain, Civ. Action No. 02-0250, 2002 WL 922383, at *2 n.22 (E.D. La. May 1, 2002), certificate of appealability denied, No. 03-30107 (5th Cir. June 23, 2003); Boyd v. Ward, Civ. Action No. 01-493, 2001 WL 533221, at *4 (E.D. La. May 15, 2001), certificate of appealability denied, No. 01-30651 (5th Cir. Aug. 22, 2001).

[13] Although petitioner subsequently filed a motion to correct an invalid sentence in 2017, such motions filed after the expiration of the federal statute of limitations have no bearing on § 2244(d)(2) tolling determinations. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Simply put: once the federal limitations period has expired, "[t]here [i]s nothing to toll." Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).

(5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

4

Perkins, 569 U.S. at 386.

Here, petitioner has not invoked Perkins. However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that he has not made the showing required under Perkins for the following reasons.

Petitioner was convicted of aggravated rape and unauthorized use of a motor vehicle. Under Louisiana law, "Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent. … Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. Rev. Stat. Ann. § 14:41. At the time of the instant offense, Louisiana law further provided, in pertinent part: "Aggravated rape is a rape committed … where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed … [w]hen the victim resists the act to the utmost, but whose resistance is overcome by force." La. Rev. Stat. Ann. § 14:42.[14] Finally, under Louisiana law, "Unauthorized use of a motor vehicle is the intentional taking or use of a motor vehicle which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, but without any intention to deprive the other of the motor vehicle permanently." La. Rev. Stat. Ann. § 14:68.4.

In assessing a petitioner's claim of actual innocence, a court normally first examines the evidence presented at trial and on which the conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept.

---

[14] The statute has since been amended to refer to this offense as "first degree rape."

17, 2014).  In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that evidence as follows:

> The victim, N.N., testified (through a Vietnamese interpreter) that she was working at Eva's (a bar) as a waitress on November 27, 2008 when Nguyen, whom she identified in court, bought her six or seven small bottles of beer.  They sat down, talked, and drank beer.  Before she drank beer with Nguyen, however, she smelled alcohol on him.  He told her that he had been to her boyfriend's house earlier and had been drinking beer with him.  Nguyen asked N.N. if she could take him to her apartment to sleep overnight.  N.N. testified that Nguyen was drunk and could not drive his car, so she drove him in her car and brought him to her apartment in Jefferson Parish.  She could not recall what time they left, but she knew her shift had started at 9:00 p.m.
>
> After arriving at her apartment, Nguyen asked her if they could open a bottle of wine that was on the table.  She testified that they drank the wine, and Nguyen was "coming on" to her.  She explained that he wanted to have sex with her, but she did not want to have sex with him.  She testified that she and Nguyen talked for over an hour and then he embraced and kissed her.  She said she told him he could not do that to her, but he did not stop.  Instead, he pushed her down onto the sofa and hit her.  She explained that he used one arm to pull her pants down and she was trying to hold his arm while trying to hold her pants.  She said that he hit her in her face and that she blocked him when he hit her.  She did not know how many times he hit her in her face.  She recalled screaming for him not to hit her, but he continued to hit her and eventually pulled her pants down.
>
> According to N.N., Nguyen then put his penis into her vagina and raped her.  N.N. testified that she pushed him out, but he hit her in her face with one hand and was holding her arm with his other hand.  N.N. said that she told Nguyen he could not do that to her and screamed.  She said she begged, but he told her to "shut up."  She testified that she did not stop screaming, and she did not stop struggling.  She said that she was raped for "a long time."
>
> N.N. testified that Nguyen put his arm to her neck and made her faint.  She did not know how long she remained unconscious, but, when she awoke, she saw that Nguyen was in her bedroom.  She ran into her bedroom, still naked, and took her purse from Nguyen.  He pushed her down and asked her for her keys.  He took her keys from her purse, as well as her phone and some money.  She testified that Nguyen ran downstairs and drove away in her car, without saying a word.  She said that Nguyen did not have her permission to take her car when he left her apartment.
>
> N.N. put her pants on and went to her neighbor for help.  She told her neighbor, Ms. Yung, that she had been hit and raped and asked her neighbor to call her boyfriend.  Her neighbor helped her call the police and served as an interpreter once the police arrived, as N.N. does not speak English.  N.N. told the police who hit and injured her, stating that she did not know Nguyen's name before the time she brought him home.  She said that her neighbor helped her to find out his name.

6

It appears from other testimony that she provided a partial name and that her neighbor happened to know Nguyen.

N.N. testified that she was shy and afraid. She explained that she did not initially tell the police about the rape, and she waited to disclose the rape when she was at the hospital. At the hospital, she was able to talk to the police through an interpreter. She was sent to a second hospital for a vaginal examination. N.N. testified that she felt pain in her vagina and anus, that her anus felt "very wet," and she believed that Nguyen had inserted his penis into her anus when she was unconscious. N.N. testified that she did not tell the doctor examining her that she was raped anally, but she did tell the doctor that she had pain in both places.

N.N. testified that the photographs presented at trial accurately depicted her condition at the time. She also took photographs of her body, including her leg and neck, with her phone, although it appears these photos were taken days after the rape. She handed the police her phone when she met with them. She testified that the bruises in the photographs were because of Nguyen, who had pushed her and used his legs to push down her legs. She also explained the bruises on her neck, saying "[h]e pushed his arm to my neck and make [sic] me fall and leave [sic] a bruise on my neck." N.N. testified that, at the time of trial, she still felt pain in the bones around her eyes.

Dr. Phillip Lee Reed, a physician employed by Ochsner Medical Center, was accepted as an expert in the field of emergency medicine. He recalled that a full "history" and a physical of N.N. was performed on November 28, 2008. Dr. Reed explained that he had treated thousands of patients, but he remembered N.N. because the amount and degree of trauma involved in her case had left an impression on him. He believed it was a sad case and recalled having to get a translator involved. A nurse, who was able to speak Vietnamese, was able to get a "history" from her. He believed the photographs presented at trial accurately depicted the victim at the time.

Dr. Reed testified that the patient said she was struck multiple times in her face and chest area with a fist. She reported a loss of consciousness and reported being raped. A physical examination revealed she appeared to have blunt force trauma, particularly concentrated around her facial area. She also had multiple abrasions, contusions, swelling, ecchymosis (bruising), and tenderness on her cheek. A CAT scan was conducted to investigate facial bone fractures and revealed that she had a fracture in the inferior orbital region in the lamina papyracea.

Dr. Reed testified that N.N. appeared to have trauma to her lip, which was contused and swollen, ecchymosis around her eye, redness and swelling around her eye, and tenderness where the fracture was. She also had trauma to the bridge of her nose. Dr. Reed testified that N.N.'s injuries were consistent with blunt force. Because of the amount of area involved, Dr. Reed believed that the injuries were not consistent with one blow but, instead, resulted from multiple blows. He did not believe one fist could cover all of the area of bruising to her forehead, lip, and both cheeks. He further testified that it was not as likely that N.N.'s injuries resulted from a strike and a fall.

Dr. Reed was questioned as to the level of force necessary to sustain such injuries. He responded that it would have taken a "[p]retty high degree of blunt force to create a fracture in the orbit," and that it required a good amount of force to break that orbital bone. He testified that the level of trauma could be consistent with the loss of consciousness. After looking at the photographs from the phone, Dr. Reed noted that the injuries were consistent with someone placing a forearm onto the neck and compressing it. Dr. Reed testified that a great deal of force had to have been used to cause this much contusion. He also testified that the injuries to the wrist and legs could be consistent with somebody pinning someone down. After examining N.N., he discharged her and sent her to get a sexual examination.

Dr. Chi Dola, an associate professor at Tulane University School of Medicine and a practicing physician, was recognized as an expert in the field of obstetrics and gynecology. She testified that, on November 28, 2008, she conducted a rape examination on N.N. Dr. Dola testified that the photographs presented accurately depicted N.N.'s physical condition at the time of the examination at Tulane Lakeside Emergency Room in Metairie. She believed N.N. was initially evaluated at Meadowcrest Hospital. Dr. Dola testified that she learned N.N. was treated for injuries and had been medically stabilized before she was transported to the Tulane Lakeside facility. She noted the extent of the injuries to N.N.'s face and her outward extremities. Dr. Dola testified that she spoke Vietnamese and that it was her native tongue. Therefore, she was able to obtain a "history" from N.N., who she learned was 37 years old and had been pregnant four times and delivered four times. She also learned N.N. was assaulted sexually by someone she knew as an acquaintance. According to Dr. Dola, N.N. reported that she was penetrated vaginally, but not orally or anally. N.N. resisted, which resulted in facial fracture, ecchymosis (skin discolorations from blood escaping into tissues from ruptured blood vessels), bruises on her thighs, and scratches on her hands. Ecchymosis most likely occurs from a forceful trauma that did not penetrate the skin. She testified that N.N.'s "history" was consistent with her claim of sexual assault.

Dr. Dola observed scratches on N.N.'s hands and wrist. She also had facial scratches, facial ecchymosis, and bruises on her thigh. She testified that the victim appeared "badly beaten up" and her eyes were practically swollen shut. She testified that N.N.'s injuries were consistent with the use of force. N.N. cried out in pain with the insertion of the speculum, a device used in routine gynecological examinations. Dr. Dola determined that N.N. had normal female genitalia and the examination revealed no lesions or trauma. Further, no trauma to N.N.'s rectum was discovered. Although Dr. Dola was not able to observe any evidence of trauma in N.N.'s vaginal area, she noted that this was not inconsistent with N.N.'s claim of vaginal penetration. She explained that data showed that 12 to 40 percent of women who had been sexually assaulted did not have evidence of injuries. Dr. Dola explained that the vagina can expand to accommodate insertions, regardless if the insertion is consensual. She also testified that she would not expect damage

to the anal area if there was anal penetration because the anus can stretch and then regain its shape. She found no secretion to collect when examining N.N.'s anus.

Tracy Wine, a Jefferson Parish police officer, testified that she responded to a call at almost 9:00,[FN 1] regarding a female who said she had been beaten up. Officer Wine testified that a neighbor was at N.N.'s apartment and was able to translate in Vietnamese. In the initial statement, the victim said through her translator that she was knocked unconscious and, when she woke up, Nguyen was gone. Officer Wine noticed the victim had a swollen cheek and her eye was starting to shut. She had bruises on her face and blood by her mouth, as well as bruises on her wrist and around her chest area. The injuries looked "fresh," with the officer testifying that it appeared the beating had occurred within a half hour. Officer Wine believed that the extent of N.N.'s injuries required medical treatment, so EMS transported N.N. to Meadowcrest. She testified that N.N. was scared and very timid and that not much detail was given at the residence. Officer Wine did not ask N.N. if she was sexually assaulted when at the residence, but she followed N.N. to the hospital and continued with the investigation, not knowing that N.N. had been sexually assaulted.

[FN 1] The transcript does not reflect whether this was a.m. or p.m.

A nurse at the hospital helped with the translation to Officer Wine. Officer Wine testified that, when she communicated with the nurse, she discovered that N.N. said she was sexually assaulted. When the officer asked why N.N. had not disclosed this before, N.N. said she was embarrassed and did not want her neighbor to know she had been sexually assaulted. Officer Wine testified that the victim appeared embarrassed, was crying, was upset, but had calmed down at the hospital. According to Officer Wine, the neighbor did not say N.N. was sexually assaulted, and it would be a surprise to learn the neighbor had known this before the officer arrived.

Detective Mike Houlihan of the Jefferson Parish Sheriff's Office investigated the rape. When Detective Houlihan went to Meadowcrest Hospital to see the victim, he observed that N.N. was "beat up pretty bad," was crying, was sluggish, and seemed kind of "out of it." Detective Houlihan testified that a nurse was able to translate. Through the investigation, Nguyen was developed as a suspect. Detective Houlihan prepared an arrest warrant for him and was notified a couple of weeks later that Nguyen had been arrested. However, Detective Houlihan testified that a deputy told him that the person who had been arrested said they had the wrong guy, and he thought the police were looking for his brother who had the same name. They also lived at the same address. The victim was shown a photographic lineup with this person's photograph, and she said that he was not the perpetrator. On the following date, Nguyen was presented in another photo lineup, and the victim made an identification. An arrest warrant for Nguyen was obtained, and Detective Houlihan was later notified that Nguyen had been arrested.

9

Detective Mike Tucker with the Sheriff's Office testified that he arrested Nguyen on February 19, 2009, after receiving a tip that he would be at a particular residence. Detective Tucker arrived and told Nguyen he had a warrant for his arrest for rape and advised him of his rights. During transportation, Nguyen initiated a statement by asking questions about the case. The detective informed Nguyen that he knew nothing about the case and had simply been there to bring him into custody. At that time, Nguyen advised that he did not rape the victim, but they had made love. Nguyen was again advised of his rights, but he went on to say he met the victim, took her home in her vehicle, and they made love. Nguyen said that, the next morning, the two had an argument, he pushed her down, and left. He said nothing about hitting the victim. Detective Tucker was confused by Nguyen's choice of words that they had "made love," as Nguyen said he had just met the victim.

Detective Houlihan obtained a recorded statement from Nguyen, which was played for the jury at trial.

In the statement, Nguyen said that he could read and write English and acknowledged that he was advised of his rights, which he understood. He was willing to waive his rights and give a statement to Detective Houlihan. Nguyen was not related to N.N., but had met her at "Eva," a lounge where she worked. He said he knew N.N. "for a long time but never got really acquainted." He believed he arrived at the lounge at about 11:00 or 11:30 p.m. and stayed there until 3:30 or 4:00 a.m. Nguyen said that they sat and talked, and he offered her a couple of drinks. N.N. drank six or more beers. According to Nguyen, N.N. indicated that she did not know if she wanted a relationship. Nguyen later saw her when he walked out. N.N. was in her car and had a stomach ache or a chest ache. She did not appear to be drunk. Nguyen asked her if she wanted him to drive her home and eventually she said yes. He had to stop and pull over because of her pain, but the pain stopped. After they arrived at N.N.'s home, they sat, talked, and opened a bottle of red wine. They drank, hugged, kissed, and then made love. While they were making love, he became tired and told her he wanted to go to sleep. They lay on the couch until morning, when he woke up and said he needed to go home so he could take his nephew shopping. Nguyen asked N.N. to drive him home, but she said no because she did not want him to go. Nguyen was going to walk home, but, as he was leaving, N.N. pulled him back and would not let him go. He became mad when she was grabbing and scratching him. Nguyen pushed N.N., but when she came back at him again, he closed his fist and punched her in her face. He punched her once, hard, and believed she fell and hit her face on the corner or arm rest of the couch. Nguyen then took her keys and her van and drove to "Eva" to get his car. He agreed he did not have her permission to take her vehicle. He left the van there and went home.

In the statement, Nguyen said that N.N. did not say "no" when they were making love. He believed the sexual intercourse was consensual. He believed N.N. was saying that it was non-consensual because she was "pissed off" at him because he hit her. He said that N.N. took off her own clothes, and he helped. Nguyen

10

    admitted that his penis went into N.N.'s vagina and that he did not wear a condom. He believed the sexual intercourse lasted maybe five minutes, and he did not believe that he ejaculated.

    Detective Houlihan acknowledged that disclosures of rape were not immediate in every case. He testified that it was not unusual for a victim to fail to report a rape immediately, and he explained that some wait hours, days, weeks, months or years. He believed this was understandable. He did not go back and talk to the neighbor because to his knowledge, the neighbor did not know of the rape. Detective Houlihan further testified that he did not believe that Nguyen hit the victim once like Nguyen said in the statement because one punch could not have caused all that injury.[15]

In light of the foregoing compelling evidence of his guilt, it would obviously be difficult for petitioner to establish that he was actually innocent of the crimes of which he stands convicted. Moreover, the United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

In the instant case, petitioner presents no new evidence whatsoever. Therefore, he cannot meet "the threshold requirement" for Perkins to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, Perkins does not aid him.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling or that the "actual innocence" exception applies, his federal

---

[15] State v. Nguyen, 88 So. 3d 511, 513-18 (La. App. 5th Cir. 2011); State Rec., Vol. 5 of 6.

11

application for habeas corpus relief had to be filed no later than **August 16, 2013**, in order to be timely. His application was not filed until on or after **January 29, 2019**, and, therefore, it is untimely.

### RECOMMENDATION

It is therefore **RECOMMENDED** that federal application for habeas corpus relief filed by Hung Nguyen be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[16]

New Orleans, Louisiana, this __20th__ day of September, 2019.

_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[16] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.